# IN THE COURT OF APPEALS OF IOWA

No. 23-1116
Filed September 27, 2023

**IN THE INTEREST OF K.K.,**
**Minor Child,**

**A.H., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Mahaska County, Patrick J. McAvan, District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Larry J. Pettigrew of Pettigrew Law Firm, P.C., Newton, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Denise McKelvie Gonyea of McKelvie Law Offices, Grinnell, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Ahlers and Chicchelly, JJ.

**BOWER, Chief Judge.**

The mother's parental rights to K.K., born in October 2021, were terminated pursuant to Iowa Code section 232.116(1)(h) and (*l*) (2022).[1] While she does not dispute grounds for termination exist,[2] the mother asserts the State failed to make reasonable efforts to reunify the mother and child, termination of her parental rights was not in the child's best interests, and a permissive exception should avoid termination. We affirm.

The child came to the department of health and human services' (HHS) attention in April 2022 due to concerns the parents were using methamphetamine while caring for the child. The child went with the mother to an inpatient program on May 6. But within three days, the mother left the program and took the child to the paternal grandmother. K.K. was adjudicated a child in need of assistance on May 10,[3] and the court ordered the child to be under HHS supervision in the paternal grandmother's care.

---

[1] The father's rights were also terminated. He does not appeal.

[2] Review of termination of parental rights proceedings is de novo. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). Our analysis follows three steps: whether grounds for termination exist under Iowa Code section 232.116(1); if so, whether termination of parental rights is in the child's best interests as defined by paragraph (2); and, if so, whether any permissive statutory exception under paragraph (3) exists to preclude termination. *Id.* Because the mother does not dispute the existence of the grounds for termination, we do not discuss this step. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

[3] The court found:

> [T]he child is a child in need of assistance pursuant to section(s) 232.2(6)(c)(2), 232.2(6)(n), and 232.2(6)(p). Father is a daily user of methamphetamine in the home, according to mother, but refuses to submit to drug testing. Mother is also a user of methamphetamine and needs treatment in order to provide safe supervision of the child. Both parents refused to drug test initially. Mother has since submitted to drug testing and is awaiting inpatient treatment placement.

A dispositional order was filed on June 14 finding that, "due to the parents' substance abuse issues and need for treatment and due to the child being an infant," continued removal from parental custody and placement with grandmother was still required. The court also found reasonable efforts were being made.

The child's guardian ad litem (GAL) reported to the court a meeting occurred on June 14 with the mother, HHS, and family service providers. The parties agreed to a plan and schedule for visits (FIP) between mother and child to be supervised by maternal uncles and grandmother, five days a week. "The pickup and drop off had a [forty-five]-minute grace period. After that, [paternal grandmother] was to cancel the visit for that day if [K.K.] was not picked up."

The mother successfully completed inpatient treatment on June 21 and moved in with her brother, the child's paternal uncle. The GAL reported:

> There were problems with the [five] days per week visitation almost immediately. First, [the mother] relapsed on alcohol (she is not 21 years old and had just left treatment). [She] was reportedly passed out at a cemetery at 3 am and called the child's father . . . to get her. I believe that was a Thursday/Friday. Then there was a misunderstanding in picking up [K.K.] for a Sunday visit. [The mother] was hours late to pick up [K.K.] thinking that the visit was later in the afternoon. [Paternal grandmother] followed the FIP and cancelled the visit. BOTH [the mother] and her brother . . . harassed [the grandmother] about following the FIP.

On June 27, the maternal grandmother instigated a confrontation when taking the child back to the paternal grandmother's home, which led HHS to temporarily limit visits to one professionally supervised interaction per week.

On June 29, the mother filed a motion for reasonable efforts. The motion states in part:

> (7) Since release from outpatient the mother has had one episode with alcohol.

(8) The relationships between the current placement, the father, and all parties in this case is a significant barrier to reunification.

(9) . . . The mother would like to reduce contact with the paternal family in this case, as she feels the constant conflict is a trigger to her sobriety.

(10) The mother asserts that the child can be safely placed with her brother as she continues to do what she needs to do to obtain care and custody of the child and avoid removal.

(11) The mother asserts there are no safety concerns that should be preventing the mother from having supervised contact with the child.

WHEREFORE the mother requests a Court Hearing on reasonable efforts, to determine the need for restricted limited contact between the mother and child, and why the child cannot be returned to the mother's care so long as they reside with another protective adult.

A hearing was held on July 18, which is the date the GAL filed her report with the court in which she noted, "This situation seems to have improved and as of July 13," the mother was receiving three supervised visits per week, two supervised by a specified maternal uncle and one supervised by service providers. The GAL noted the paternal grandmother was "an appropriate and loving placement" for the child, who was bonded with the grandmother. The court continued further hearing until August 16 and later suspended it. A permanency hearing was set for October 4.

On October 15, the juvenile court entered a permanency order in which it was stated:

The following facts have been shown to exist: Mother is addicted to methamphetamine, and also abuses other substances. Mother's relationship with father is volatile. Both parents have been dishonest to [HHS] and providers about the status of their relationship and their substance abuse. Father has been largely non-compliant with [HHS] and has been unwilling to address his methamphetamine abuse. Mother completed inpatient substance abuse treatment at Oak Meadow, but has not been able to maintain her sobriety. Mother is struggling to grasp and follow parenting

concepts in SafeCare. The child is safe in paternal grandmother's home.

. . . .

The facts found establish by a preponderance of the evidence that the child would suffer an adjudicatory harm were the child returned to the care and custody of the child's parents.

The facts found establish convincing evidence that termination of the parent-child relationship between the child's parents and the child in interest would not be in the best interest of the child, that services were offered to the child's family to correct the situation which led to the child's removal, and that child cannot be returned home. The child is with paternal grandmother in a safe and stable home.

The facts found establish by a preponderance of the evidence that substantial progress toward reunification has been made and that it is reasonably likely that the child can safely be returned home with an additional six months of reunification services.

Specifically, the court noted these factors, conditions, and expected behavior changes were required to determine the need for removal will no longer be necessary: "parents will remain substance free, have appropriate housing, be cooperative with mental health and substance abuse treatment, successfully complete SafeCare program, establish functional boundaries in their personal relationship and demonstrate the ability to safely co-parent." The mother was also required to participate in random drug screening. The permanency order was not appealed.

The mother had a sweat-patch test removed on October 28. Later that night, the mother and a service provider ran across one another in a bar; the mother told the worker she had relapsed on alcohol and methamphetamine and asked if the worker had to report it. The worker confirmed she did have to, which she followed through with on October 29. Over the weekend, the mother contacted her HHS social worker and shared she had relapsed on methamphetamine and alcohol and she stated she was going to try to get into inpatient treatment.

A petition to terminate the mother's parental rights was filed on November 1. On November 5, the mother underwent a mental-health and substance-abuse evaluation and reported she had used methamphetamine and had drank alcohol from October 31 to November 2. It was recommended the mother engage in extended outpatient mental-health and substance-abuse treatment including treatment and support groups, abstaining from alcohol and illicit substances, and continuing to practice coping strategies and relapse-prevention strategies.

Unfortunately, despite ongoing services being offered to the mother, she continued to struggle with her sobriety and mental health. The mother's substance-abuse counselor reported the mother had two drug screens in November that were positive for methamphetamine. Her probation officer shared the mother reported methamphetamine and marijuana use to him on December 28. The mother failed to submit to drug testing HHS requested in January and March 2023.

In anticipation of the scheduled permanency review and termination of parental rights hearing (April 25), the mother requested a solution focused meeting, which was held on in April 3, 2023. During that meeting the plan developed was: the mother will complete substance-abuse treatment (she was hoping to attend inpatient), continue her mental-health services, sign any needed releases of information, comply with random drug testing, continue to follow the rules of her probation, and communicate with the family support specialist (FSS) concerning visits weekly.

Evidence was presented on April 25, May 16, and June 7 showing the mother has mental-health issues and was periodically in treatment. There was

evidence presented the mother and father had an altercation on April 27 that became violent, both parents were injured, and the mother's car was damaged by the father. On May 2, the mother admitted to her probation officer she used methamphetamine three days earlier and marijuana the day before. She was admitted into a residential substance-abuse treatment on May 18; she left the program during her first night and did not return. The mother continued to struggle with illegal substances—including alcohol (she was not yet twenty-one years old). The court found she "could not maintain sobriety for more than a few weeks at a time even with the reasonable efforts being provided to her by [HHS] and other agencies."

On appeal, the mother contends HHS did not provide reasonable efforts because they failed to transition to semi-supervised visits in 2022 due to a single episode of drinking, a substance that was of no concern when the case began. In evaluating claims that HHS failed to provide reasonable efforts, the court's "focus is on the services provided by the state and the response by [the parent], not on services [the parent] now claims the [H]HS failed to provide. *In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000).

The mother's minimization of a "single episode" of drinking downplays the situation. As noted by the HHS social worker:

> Well, I mean, I don't think that it's difficult to say that when we have a conversation with a client and then the next day they test positive and eventually self-admit that they were using alcohol or whatever substance, when we had just had a conversation in a staffing about moving to semi-supervised and the next day we have issues with a relationship where she's not honest with us and where she's testing positive for alcohol.
> I mean, there's significant issues with her sobriety, so for us to move to semi-supervised when she's, again, positive for alcohol—

I mean, in any case we wouldn't do that. . . . I may not have been the worker at the time, but if that was my case today, . . . I wouldn't be supportive, nor would I expect the [GAL] to be supportive of that, either.

The social worker noted that during the October 2022 permanency hearing where HHS requested an extension, the presiding judge was concerned about the extension and informed the parents that if they did not follow through with expectations a termination petition could be filed.

The evidence shows the mother has been provided an extended period of numerous services in efforts to achieve reunification, including supervised visitation, solution-based casework, family-centered services, parent-partner referrals, mental-health evaluations and counseling, substance-abuse evaluations and treatment support, and family support. The mother's June 2022 request for reasonable efforts appears to have been accommodated and she made no new request. And the concerns of HHS were unfortunately founded by the mother's ongoing substance abuse.

The juvenile court found HHS "did not fail" the mother.

Rather, [HHS] acknowledged her progress and accomplishments by recommending an additional six months at the permanency hearing in October 2022. Unfortunately, [the mother] was discovered in the middle of a significant relapse on Halloween weekend 2022. As first identified by her substance abuse provider in July 2022, [she] does not have good coping mechanisms and struggles to take responsibility for her negative behaviors. Despite the services offered and support provided by the department, [the mother] did not cope with this backstep and struggled over the next several months. The evidence is clear that the department provided reasonable efforts and is not the party responsible for [the mother's] negative choices since the permanency hearing.

On our de novo review, we agree with the juvenile court the State made reasonable efforts at reunification.

Turning to the mother's contention that termination of her rights is not in the child's best interests, she also notes her "strong bond" with K.K.[4] We "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

K.K. has been out of his mother's care for more than a year and we find clear and convincing evidence the mother cannot offer K.K. the permanency and stability this young child needs and deserves. The mother has unresolved substance-abuse and mental-health issues that are a barrier to her ability to provide "constant, responsible, and reliable" parenting. *See In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) ("Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable.").

K.K. is integrated into the home of the paternal grandmother, where he has been for the majority of his life. The grandmother is willing and able to be the

---

[4] The mother does not separately contend she has met her burden to prove an exception exists to avoid termination of her parental rights. *See A.S.*, 906 N.W.2d at 476 ("[O]nce the State has proven a ground for termination, the parent resisting termination bears the burden to establish an exception to termination under Iowa Code section 232.116(3) . . . ."). In any event, the juvenile court did consider the statutory exceptions and found:

> The evidence shows the parents love [K.K] and [K.K.] knows his parents and enjoys their visits. Love alone is not sufficient to satisfy the burden a parent has to show termination of parental rights would be detrimental to the child. The evidence shows that [K.K.] loves his grandmother and custodian . . . as well as other extended family members. The evidence presented does not establish termination of parental rights would in any way be detrimental to [K.K.]

*See* Iowa Code § 232.116(3)(c) (allowing court to avoid termination of parental rights if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship").

permanent solution for K.K.'s long-term needs. We conclude K.K.'s best interests are served by termination and adoption so he can achieve permanency and stability. We affirm.

**AFFIRMED.**